John W. **DORNEY**, Plaintiff,

v.

**DAIRYMEN'S LEAGUE COOPERATIVE ASSOCIATION, Inc., Defendant.**

Civ. A. No. 542–56.

United States District Court
D. New Jersey.
March 13, 1957.

Van Blarcom, Silverman & Weber, Newton, N. J., by Frank G. Schlosser, Newton, N. J., for plaintiff.

Stryker, Tams & Horner, Newark, N. J., by William L. Dill, Jr., and Walter F. Waldau, Newark, N. J., for defendant.

MODARELLI, District Judge.

Plaintiff, a clergyman in Sussex County, New Jersey, who doubles as Executive Director of the Tri-State Dairy Farmers' Guild, complains that defendant, a New York corporation, published in its newspaper, The Dairymen's League News of June 5, 1956, the following editorial which allegedly libelled him:

"REV. DORNEY AND CO.

"THE REV. John W. Dorney, New Jersey's apostle of the Get-Rich Quick dogma, again, moved into Central New York during the past week; this time following a promotional drumming of newspaper advertisements, radio entreaties, and handbill harranguing.

"Mr. Dorney, who accomplished the transition from Longshoremen's Union organizer to ecclesiastical cohort of the Teamsters Union by way of a Balesville, N. J. pulpit, was accompanied by high-salaried Homer Martin of Detroit, one-time organizer of the United Auto Workers and recent leader of the ill-fated Detroit milk strike.

"This combination of union drumbeaters, blasted the DAIRYMEN'S LEAGUE NEWS as 'a rag' from their dance hall meeting place for reprinting in the last issue an article which exposed the inter-union fight in Michigan for control of rump-group producers. This blast at the DAIRYMEN'S LEAGUE NEWS for its exercising an editorial prerogative was punctuated with additional blasts at all established farmer cooperatives for 'exploitation of its members' and apparently, for not championing the cause of the Teamsters in the Milkshed.

"The Rev. Dorney stuck to his gospel of $6 a hundredweight for all milk, but, as usual, carefully skirted how such a blend could be accomplished without pricing milk away from the consumer.

"Mr. Martin's appearance in the Utica area was and is a source of amazement to those who have been keeping tabs on the Detroit marketing area's acrobatics.

"In that area, Mr. Martin, who once headed the only 'Fair Share' group, and focused all his vituperation on Michigan Milk Producers Association, is now head of one of the two 'Fair Share' groups which are fighting each other with more spirit than was ever exerted against the MMPA.

"Homer Martin and his followers (by the way he received $3,000 from Mr. Dorney during his strike) now head the Fair Share Milk Bargaining Association. The CIO, which once gave Brother Martin short shift, is sponsoring the rival Fair Share Bargaining Association. Martin's position may best be explained by again taking the liberty of reprinting from the Lapeer County Press, Lapeer, Mich.:

" 'It's true that Martin has returned to the attack of MMPA in recent meetings. But he does so with the air of a general who's worried about an attack from the rear * * *.' So much for Mr. Martin—now.

"At the Marcy meeting, it must be noted, just six of the more than 200 who attended the meeting indicated they wanted to join Mr. Dorney. Refreshments were served— took four bartenders to serve them."

Plaintiff seeks compensatory damages of $500,000, and punitive damages of $1,-000,000. No special damages have been pleaded. This opinion is directed to defendant's motion to dismiss on the ground that the complaint fails to state a claim upon which relief can be granted.

Fed.Rules Civ.Proc. rule 12(b) (6), 28 U.S.C.A.

■■■ Federal jurisdiction of this case rests upon diversity of citizenship and the requisite amount in controversy. The substantive rights of the parties are to be determined according to local law. Erie R. Co. v. Tompkins, 1938, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188. Included within such applicable law is the local rule of conflicts. Klaxon Company v. Stentor Electric Mfg. Co., Inc., 1941, 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L. Ed. 1477. The State of New Jersey follows the general rule that the law of the place where the alleged tort was committed governs. See Kieffer v. Blue Seal Chemical Co., 3 Cir., 1952, 196 F.2d 614; Zephyr American Corporation v. Bates Mfg. Co., D.C.N.J.1945, 59 F.Supp. 573. The journal in question was published in Poughkeepsie, New York. The law of the place where the cause of action accrued governs in the creation of substantive rights. Hartmann v. Time, Inc., 3 Cir., 1948, 166 F.2d 127, 133, 1 A.L.R. 2d 370. New York follows the so-called "single publication" rule. Wolfson v. Syracuse Newspapers, 1948, 254 App. Div. 211, 4 N.Y.S.2d 640, affirmed 1939, 279 N.Y. 716, 18 N.E.2d 676.

What is the scope of the court's inquiry upon a motion to dismiss under the Rule 12(b) (6)? The Third Circuit has observed in Frederick Hart & Co. v. Recordgraph Corp., 169 F.2d 580, 581:

"It is also well-settled that on a motion to dismiss the complaint must be viewed in the light most favorable to the plaintiff and that the complaint should not be dismissed unless it appears to a certainty that the plaintiff would not be entitled to relief under any state of facts which could be proved in support of his claim; further, no matter how likely it may seem that the pleader will be unable to prove his case, he is entitled, upon averring a claim, to an opportunity to try to prove it. We so held in Con-

tinental Collieries v. Shober, 3 Cir., 1942, 130 F.2d 631, 635."

The rule is also considered in Carroll v. Morrison Hotel Corp., 7 Cir., 1945, 149 F.2d 404, 406; United States v. Association of American Railroads, D.C.Neb. 1945, 4 F.R.D. 510.

The grounds for dismissal were spelled out further in the succinct language of De Loach v. Crowley's, Inc., 5 Cir., 1942, 128 F.2d 378, 380:

"A petition may be dismissed on motion if clearly without any merit; and this want of merit may consist in an absence of law to support a claim of the sort made, or of facts sufficient to make a good claim, or in the disclosure of some fact which will necessarily defeat the claim."

■■■ It is instructive to note that the motion to dismiss under Rule 12(b) (6) performs substantially the same function as the old common law general demurrer. A motion to dismiss is the proper method of testing the legal sufficiency of the complaint. Galbreath v. Metropolitan Trust Company of California, 10 Cir., 1943, 134 F.2d 569; 2 Moore's Federal Practice (2d Ed.1948), pp. 2254, 2255.

■■■ To summarize, the decisions interpreting Rule 12(b) (6) reiterate that complaint should not be dismissed for insufficiency *unless it appears to a certainty that plaintiff is entitled to no relief under any state of facts which could be proved in support of the claim.*

■■■ Notwithstanding the liberal interpretation of Rule 12(b) (6) set out above, it is necessary for the plaintiff to allege a "claim," a legal right, the invasion of which by defendant has caused damage to the plaintiff. Moreover, while the court may not decide questions of fact on this motion, the mere compilation of facts cannot sustain a complaint which fails to allege the invasion of a right recognized in law. As the Supreme Court has said, "A cause of action does not consist of facts, but of the unlawful violation of a right which the facts

show." Baltimore S.S. Co. v. Phillips, 1927, 274 U.S. 316, 321, 47 S.Ct. 600, 602, 71 L.Ed. 1069.

The grounds advanced in support of the motion are (1) that the writing is not libelous *per se*, and (2) that the publication was made under a qualified privilege of fair comment and criticism. Defendant insists that the publication, when read and construed in the sense in which readers would ordinarily understand it, if given a reasonable construction, does not reflect upon the plaintiff as a clergyman, and is, therefore, not libelous, without averment of special damage.

█ The first and important question to be determined is whether or not the alleged publication is libelous *per se*, because, if not, the ground should be sustained and the suit dismissed. Keller v. Loyless, 2 Cir., 1913, 205 F. 510; Berg v. Printers' Ink Pub. Co., Inc., D.C. S.D.N.Y.1943, 54 F.Supp. 795, affirmed 2 Cir., 1944, 141 F.2d 1022. No useful purpose would be served by reviewing the many decisions, both state and federal, on the law of defamation. The rules of law as summarized in the Restatement of the Law of Torts, §§ 570–574, recite that, in order to be libelous per se, the written words must impute a criminal act, a loathsome disease, or other act involving moral turpitude or incompatible with the conduct of his lawful business or profession. Referring to an accused article, it was noted in the Berg case, supra, 54 F.Supp. at pages 795, 796, that "To be libelous per se it must tend to expose plaintiff to public contempt, obloquy, scorn, aversion, ridicule, hatred, shame or disgrace, or to induce an evil opinion of him in the minds of right thinking persons, and to deprive him of their friendly intercourse in society." See cases cited thereat, especially Sweeney v. Schenectady Union Pub. Co., 2 Cir., 1941, 122 F.2d 288, 290, affirmed 1942, 316 U.S. 642, 62 S.Ct. 1031, 86 L.Ed. 1727.

█ It is also the general rule of construction that the writing as a whole must be considered and not words or phrases out of context. Restatement of the Law of Torts, § 563(d). "In order to determine whether or not it contains matter libelous *per se*, the entire article must be read and considered as a whole * * *." Schy v. Hearst Pub. Co., 7 Cir., 1953, 205 F.2d 750, 752. Another general rule applicable in this case is that the words of the publication must be viewed in their usual and commonly-accepted meaning; special meanings of a derogatory nature must be specially pleaded in the complaint by way of innuendo, explanation or colloquium. Restatement of the Law of Torts, § 563(e) and (f). This was not done.

The application of these rules by New York courts was recently made in Nichols v. Item Publishing Co., 1956, 309 N.Y. 596, 132 N.E.2d 860. The plaintiffs, a minister and his congregational board, sued defendant newspaper for libel, alleging no special damages. The defendant's motion to dismiss had been denied but that ruling was reversed on appeal, which reversal was affirmed by the Court of Appeals, which said in part:

"The general rule, we stated in Mencher v. Chesley, 297 N.Y. 94, 100, 75 N.E.2d 257, 259, is that 'A writing is defamatory—that is, actionable without allegation or proof of special damage—if it tends to expose a person to hatred, contempt or aversion, or to induce an evil or unsavory opinion of him in the minds of a substantial number of the community, even though it may impute no moral turpitude to him.' And to that listing of the defamatory should be added a writing which tends to disparage a person in the way of his office, profession, or trade. [cases cited] * * * The rule is no different for a clergyman, exalted and sensitive though his post may be. A charge against him, to be actionable, must still 'be such as, if true, would tend to prove him unfit to continue his calling.'" 132 N.E.2d 860, 861, 862.

█ Tested by the foregoing rules, laid down by the text writers and report-

ed cases, is the publication in question libelous *per se*? Does it reflect upon plaintiff in the pursuit of his calling? Or does it injure plaintiff in a pecuniary way? It bears repeating that, in determining whether or not the publication in question is libelous *per se*, one must read the entire editorial, and, from the whole, say whether or not the statements made therein would necessarily produce the view in the minds of sensible persons that plaintiff was an "ecclesiastical faker," as plaintiff's counsel phrased it, or to disgrace plaintiff and injure him by exposing him to public ridicule, hatred, scorn, infamy, ignominy, and shame. A consideration of the accused editorial shows that it concerns matters of public concern that had been the subject of prior public discussion. It concerned a public issue which was publicly debated by the plaintiff on a public platform in Marcy, New York. It admits of no other reasonable interpretation than that it is an effort to refute an economic theory propounded by the plaintiff and his organization. The statements all revolve around a milk price theory. There are rhetorical flourishes which draw upon theological expressions, such as "dogma," "apostle," and "gospel," but all these are within the permissible range of euphemism and metaphor which so frequently are found in editorial comment today. There is no imputation of anything degrading to the ministerial calling.

The common law has long recognized that words of general abuse, regardless of how crude, uncouth, or vexatious, unless defamatory within themselves, cannot serve as a basis for a defamation action in the absence of an allegation of special damages. See cases cited in 37 A.L.R. 885, § II.

The editorial in question is not libelous *per se*, and, therefore, the complaint does not state a claim upon which relief can be granted. Having determined that there is no actionable character to the complaint as it stands, it is unnecessary to proceed to a consideration of the sec-

ond ground for the pending motion, viz., qualified privilege.

Motion granted.

An order may be submitted in conformity with the opinion herein expressed.